IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

CLERKS OFFICE US DISTRICT COURT
AT ROANOKE, VA
FILED

**July 08, 2025**
LAURA A. AUSTIN, CLERK
BY: **/s/ S. Wray**
DEPUTY CLERK

| | | |
|---|---|---|
| RICHARD M.,[1] | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 7:24-CV-409 |
| | ) | |
| FRANK BISIGNANO, | ) | By: Hon. Michael F. Urbanski |
| Commissioner of Social Security,[2] | ) | Senior United States District Judge |
| | ) | |
| Defendant | ) | |

## MEMORANDUM OPINION

Plaintiff Richard M. ("Richard") filed this action challenging the final decision of the Commissioner of Social Security denying his claim for a period of disability insurance benefits ("DIB") and supplemental security income ("SSI") under the Social Security Act, 42 U.S.C. §§ 423 and 1381a. In his brief in support of his application, Richard argues that the determination of the administrative law judge ("ALJ") that he is not disabled is not supported by substantial evidence. Pl.'s Br., ECF No. 13. The Commissioner responds that substantial evidence supports the ALJ's determination that Richard is not disabled. Comm'r's Br., ECF No. 17.

As discussed more fully below, the court finds that substantial evidence supports the ALJ's determination that Richard is not disabled. Accordingly, the Commissioner's determination that Richard is not disabled is **AFFIRMED**, Richard's Complaint is **DISMISSED**, and this matter is **STRICKEN** from the court's docket.

---

[1] Due to privacy concerns, the court adopts the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States that courts use only the first name and last initial of the claimant in social security opinions.

[2] Frank Bisignano was sworn in as the Commissioner of Social Security on May 7, 2025. In accordance with Fed. R. Civ. P. 25(d) and 42 U.S.C. § 405(g), he is substituted as defendant.

## I. Judicial Review of Social Security Determinations

It is not the province of a federal court to make administrative disability decisions. Rather, judicial review of disability cases is limited to determining whether substantial evidence supports the Commissioner's conclusion that the plaintiff failed to meet his burden of proving disability. See Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990), and Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966). The court will uphold a Social Security disability determination if "'(1) the ALJ applied the correct legal standards and (2) substantial evidence supports the ALJ's factual findings.'" Oakes v. Kijakazi, 70 F.4th 207, 212 (4th Cir. 2023) (quoting Arakas v. Comm'r Soc. Sec. Admin., 983 F.3d 83, 94 (4th Cir. 2020)).

A court may neither undertake a de novo review of the Commissioner's decision, reweigh conflicting evidence, nor substitute its judgment for that of the ALJ. Id. Evidence is substantial when, considering the record as a whole, it might be deemed adequate to support a conclusion by a reasonable mind, Richardson v. Perales, 402 U.S. 389, 401 (1971), or when it would be sufficient to refuse a directed verdict in a jury trial. Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996). Substantial evidence is not a "large or considerable amount of evidence," Pierce v. Underwood, 487 U.S. 552, 565 (1988), but is more than a mere scintilla and somewhat less than a preponderance. Laws, 368 F.2d at 642. "It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Biestek v. Berryhill, 139 S.Ct. 1148, 1154 (2019) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed. 42 U.S.C. § 405(g); Perales, 402 U.S. at 401.

2

Nevertheless, the court does not "'reflexively rubber-stamp an ALJ's findings.'" Oakes, 70 F.4th at 212 (quoting Arakas, 983 F.3d at 95). Remand is appropriate when the ALJ's analysis is so deficient that it "frustrate[s] meaningful review." See Mascio v. Colvin, 780 F.3d 632, 636–37 (4th Cir. 2015) (noting that "remand is necessary" because the court is "left to guess [at] how the ALJ arrived at his conclusions"). See also Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016) (emphasizing that the ALJ must "build an accurate and logical bridge from the evidence to his conclusion" and holding that remand was appropriate when the ALJ failed to make "specific findings" about whether the claimant's limitations would cause him to experience his claimed symptoms during work and if so, how often) (citation omitted).

## II. Claim History

Richard was born in 1974, completed the ninth grade, and obtained a GED in 1996. R. 42, 241. He has past relevant work as a dishwasher.[3] R. 24. Richard filed his current application for benefits on November 2, 2020, alleging an onset date of March 1, 2019. He alleges disability based on being "paranoid due to being in prison for 9 years, no movement in left arm, left eye has vision problems." R. 299. His reported symptoms include an inability to trust people, auditory hallucinations, trouble sleeping, no use of left arm, feeling uncomfortable around other people, tearfulness, anxiety, and headaches. R. 328–30, 46–49, 51, 54–56. Richard served twelve years in prison and has a history of addiction to opioids and methamphetamine. R. 40, 57, 325, 399, 663. Richard's application for benefits was denied at all administrative levels. R. 95–116, 14–26, 1–3.

---

[3] As discussed below, Richard has had several jobs over the years. But only the dishwasher job rose to the level of substantial gainful activity during the relevant time period. R. 24, 39–40.

When the ALJ issued her determination following the administrative hearing, she applied the five-step evaluation process described in the regulations. R. 14–26.[4] The ALJ first found that regarding Richard's DIB claim, he met the insured status requirements through September 30, 2025. Richard had not engaged in substantial gainful activity since his alleged onset date of March 1, 2019. R. 15–17. The ALJ further found that Richard had severe impairments of drug and alcohol abuse, depressive disorder, and anxiety disorder, but that none of the impairments met or medically equaled the severity of a listed impairment. R. 17–19. The ALJ found Richard's other alleged impairments, including his status post shoulder joint replacement surgery, to be non-severe. R. 17.

The ALJ found that Richard had the residual functional capacity ("RFC") to do a full range of work at all exertional levels with the following non-exertional limitations: He could perform simple, routine, and repetitive tasks, could make simple work-related decisions in terms of judgment, workplace stress, or changes in the work setting; he must be notified 24 hours in advance, or a day in advance, of any workplace changes; and he could have frequent interaction with supervisors, occasional interaction with coworkers, and no interaction with

---

[4] The ALJ makes a series of determinations: (1) Whether the claimant is engaged in substantial gainful activity; (2) Whether the claimant has a medically determinable impairment that is "severe" under the regulations; (3) Whether the severe impairment or combination of impairments meets or medically equals the criteria of a listed impairment; (4) Whether the claimant has the residual functional capacity ("RFC") to perform his past relevant work; and (5) Whether the claimant is able to do any other work in the national economy, considering his RFC, age, education, and work experience. 20 C.F.R. §§ 404.1520(a) and 416.920(a). If the ALJ finds that the claimant has been engaged in substantial gainful activity at Step 1 or finds that the impairments are not severe at Step 2, the process ends with a finding of "not disabled." Mascio v. Colvin, 780 F.3d 632, 634-635 (4th Cir. 2015). At Step 3, if the ALJ finds that the claimant's impairments meet or equal a listed impairment, the claimant will be found disabled. Id. at 635. If the analysis proceeds to Step 4 and the ALJ determines the claimant's RFC will allow him to return to his past relevant work, the claimant will be found "not disabled." If the claimant cannot return to his past relevant work, the ALJ then determines, often based on testimony from a vocational expert, whether other work exists for the claimant in the national economy. Id. The claimant bears the burden of proof on the first four steps and the burden shifts to the Commissioner on the fifth step. Monroe v. Colvin, 826 F.3d 176, 178–79 (4th Cir. 2016).

the public. The claimant would be off task approximately eight percent of the total workday due to mental impairments. R. 19. The ALJ found that Richard could return to his past relevant work as a dishwasher, and also could work as an automobile detailer, home or office cleaner, or a linen or laundry sorter. R. 24–25. Thus, the ALJ found Richard not disabled. R. 26. Richard sought review from the Appeal's Council, which denied review on May 10, 2024. R. 1–3. This lawsuit followed.

### III. Evidence

#### A. Medical Records

On January 3, 2019, Richard presented to the emergency room with symptoms of withdrawal from opiates. He said he had been prescribed opiates following shoulder surgery one year previously but that his doctor had "cut him off." He had been obtaining opiates from occasional clinic and emergency room visits, and from friends. R. 399. He was given non-opiate medication to blunt the discomfort of withdrawal and discharged home. R. 401.

On January 21, 2019, Richard began receiving care at Roanoke Treatment Center, including Medication Assisted Treatment (MAT) for opioid dependency. R. 681. In addition to medication, Richard agreed to start attending group mental health treatment sessions. R. 680. Despite agreeing that he would attend treatment from January through April 1, 2019, Richard did not attend any group sessions. On April 1, 2019, he once again agreed to start doing so and told his counselor that he had changed his work shift from third shift to second shift so that he could attend classes and counseling before taking his children to school in the morning. R. 679.

5

On July 22, 2019, Richard met with a counselor and reported that his overall functioning during the day was good. He wanted to reduce the amount of medication he was taking as he did not want to be in treatment long term. He told the therapist that he wanted to seek further employment to help with his finances. R. 677.

On July 26, 2019, Richard struggled to identify what he thought he needed to work on and denied mental health needs despite their being on his last treatment plan. He denied anxiety, although he had a slightly anxious affect during the treatment plan update. R. 676.

On February 11, 2020, Richard met with a new counselor and his demeanor was described as somewhat rude and impatient, "almost to the point of being noncompliant." He told the counselor that he was in a hurry to get to work and did not have time "to deal with this." R. 674. On February 25, 2020, Richard was counseled regarding a positive drug screen and said he had been taking cough syrup for bronchitis symptoms and he smoked marijuana daily. He reported having full custody of his 10-year-old son and 12-year-old daughter. He asked to attend groups on the weekend as he worked during the week. Id.

On March 13, 2020, Richard appeared agitated and said he was going to get fired. He told the counselor that everything was going well with his children. He was continuing to use illicit drugs and had not attended any group sessions that month. R. 673.

On May 28, 2020, Richard reported during a telehealth session that he had been doing well overall during the COVID-19 pandemic. He was not working but was receiving unemployment and "stimulus money." His children were doing well. R. 671.

On October 7, 2020, Richard told his counselor he was feeling stress because his children were doing virtual schooling. He said that although he sometimes felt depressed, he

6

was not currently depressed. He was interested in tapering off suboxone but wondered if it might be easier to taper off methadone. He was advised to discuss the question with the doctor at the clinic. Richard was described as fully oriented, lucid, and cooperative. R. 669. On December 22, 2020, Richard tested positive for amphetamine. He denied use and attributed the positive screen to a nutrition drink. R. 668.

On May 24, 2021, Richard was upset because his counselor had changed. Despite a positive drug screen for methamphetamine, he denied drug use. He was told he needed to attend group sessions and was offered a list of meetings, but he "stormed out." R. 665.

On July 8, 2021, Richard requested an increase of his medication because of restlessness at night, sweating, mild cravings, and insomnia. It was determined that he was not eligible for a medication increase because he continued to test positive for amphetamines. Richard denied medical or mental health needs. He appeared to be in the action phase of recovery from drug addiction based on his recent desire to stop using illicit substances, although he struggled to engage fully in treatment. R. 663.

On August 30, 2021, treatment notes indicate that Richard had stopped using illicit amphetamines but then relapsed after breaking up with his girlfriend and moving to a motel. He showed no signs of neglect, was appropriately dressed, and communicated effectively. He showed signs of high anxiety, use of amphetamines, or both, as he was shaky and had difficulty sitting still. However, his pupils appeared normal and he maintained proper eye contact with the counselor. R. 660.

On September 20, 2021, the counselor noted her belief that Richard was continuing to use illicit amphetamines. He was unable to sit still, did not make eye contact, had rapid

7

movements and high energy. He denied use of illicit drugs and the counselor was going to ask for additional testing. R. 659. On November 30, 2021, Richard reported that he was trying to stop using illicit drugs because he wanted to keep his job as he enjoyed it and believed he was making better money. R. 658.

On February 15, 2022, Richard had an annual physical where his mental status exam was within normal limits and he reported no symptoms of withdrawal or cravings. His opioid use disorder was stable using MAT. R. 655. On April 6, 2022, Richard was described as "calm and pleasant," although he reported continued use of methamphetamines. He no longer was working although he did not disclose a reason for not working. R. 651.

On August 19, 2022, Richard said he had been trying to decrease his use of amphetamines but was struggling. He was not working but was taking care of his son. He was in the precontemplation stage of recovery from drug abuse as evidenced by his lack of coping skills and employment and consistent positive drug screens. R. 650. A drug screen on November 21, 2022, was "non-illicit" and Richard reported withdrawal symptoms on his current MAT. R. 645. On December 28, 2022, Richard was described as "stable" and in the action stage of treatment. R. 644. On January 12, 2023, Richard was in the maintenance stage of treatment as evidenced by his negative drug screens and his active engagement in treatment. R. 642.

Richard began treatment at Intercept True North Health Clinic on September 22, 2021, which overlapped with his treatment at the Roanoke Treatment Center. At his initial evaluation, Richard said he had not been on psychiatric medication for three or four years but had taken gabapentin and Xanax daily before that. He reported feeling depressed and tearful

8

and had a lack of interest in things like football games. He had racing thoughts about paying bills and thought about death often. He had panic attacks and shaking in his hands, shortness of breath and a racing heart. He picked his scalp causing scabs. He frequently checked the door even when he knew it was locked, was irritable, and would slam items on the table. He felt like other people were talking about him and he had left jobs because of that. He denied audio or visual hallucinations. Going to the grocery store made him nervous. R. 476.

Richard appeared neatly dressed and well-nourished. His thought process was logical but tangential at times. His concentration was impaired and his judgment and insight were fair. His mental health status was otherwise within normal limits. R. 477. He was assessed with problematic anxiety, moods, and sleep. He was started on Buspirone and was told he could start gabapentin following a negative drug screen. R. 477–78. The next month Richard reported that the Buspirone made him feel sick so he stopped taking it. R. 480. His mental health assessment was unchanged with the exception that attention and concentration were intact. He was started on hydroxyzine for anxiety. R. 486. His diagnoses were listed as unspecified social phobia, generalized anxiety disorder, and major depressive disorder, single episode, unspecified, and unspecified mood (affective) disorder. R. 485.

On November 2, 2021, Richard reported that he was staying at a shelter with his son because of challenges in his relationship with his girlfriend. He felt that the medications were helping with his anxiety and he felt able to keep his composure. He was going to start a new job at a convenience store and was looking for a second job. He reported feeling anxious with going out and being around others. R. 491.

On January 11, 2022, Richard stated that he was working at a packaging center and that he enjoyed working. He asked for an increase in his gabapentin, while also describing his moods as improving and his anxiety as under better control. He and his girlfriend and son were living together. Richard reported more irritability during the day but also being calmer with his son who was often defiant. He had anxious thoughts at night such as worrying about whether he would wake up on time. R. 502.

On June 13, 2022, Richard reported that his anxiety had been "up and down" and that he felt depressed transiently. He reported multiple stressors, including his son's behavior. He denied panic attacks but continued with social anxiety, although he was able to shop. He said his irritability was improving but he had trouble staying asleep at night. R. 524. Trazodone was added for sleep maintenance and his gabapentin dose was increased. R. 530.

The next month Richard said that the medication increase helped with his anxiety and sleep. He continued with social anxiety and tried to shop quickly. He also continued with transient depression. R. 535. On September 16, 2022, Richard told his health care provider that his medications remained effective and his sleep had improved. He had persisting depression and anxiety but did not ask to adjust his medications. R. 546. On October 21, 2022, Richard stated that he had anxiety, depression, and mood swings, as well as stress related to his son's behavior. He was sleeping well and had lost weight, which he felt happy about. He had been busy with classes at a local shelter. R. 557.

Richard underwent a consultative mental status examination and BioPsychoSocial assessment on May 8, 2023. He was described as cooperative but fidgety. He had seemingly uncontrolled left arm/hand movements which abated once he placed his hand in his jacket

10

pocket. He described himself as "a little anxious" and said his mood was typical. His thought process was linear and goal directed, his sensorium was intact, and his judgment, insight, and general fund of knowledge were described as "fair." He was unable to identify the number of weeks in a year, identified Martin Luther King, Jr., as an "activist," inaccurately identified the number of ounces in a pound, correctly identified the number of quarters in one dollar and fifty cents, accurately recalled a six-digit number span immediately after it was stated by the examiner, and accurately recalled two of three words after a ten-minute delay. R. 692.

Richard reported that he was not working and that he had most recently been employed by a temporary employment service in 2021 where he stacked boxes and books. He said he had had 30 jobs in the past eight years because he starts feeling like people are after him and plotting against him which causes him to resign. He said most days he feels like he is going to die and expressed that he was unable to work because of his paranoia and anxiety. Id.

Richard said he is always looking over his shoulder, thinking someone is going to kill him. He waits to grocery shop until the store is almost closed when fewer people are shopping. He reported auditory hallucinations telling him that someone is trying to kill him and said he did not sleep well because of fear that someone was going to break into his house and kill him. R. 693. He liked to watch sports and true crime shows on television. He did not go to church because there were too many people there. He believed a car battery would be too heavy for him to pick up with his left arm. He lived alone and was able to take care of his needs. Id.

The examiner concluded that Richard's prognosis currently was poor. He could likely manage his funds and was believed to be able to perform sustained simple or complex tasks with or without supervision but might have limitations because of his left arm impairment.

11

From a behavioral mental health standpoint, Richard endorsed a significant history of relationship disruption, vocational failure, and maladaptive behaviors, as evidenced by numerous stays in juvenile detention and prison. He met the criteria for a social anxiety disorder and major depressive disorder with psychotic features as well as antisocial personality disorder. The examiner believed Richard should continue receiving outpatient mental health services and subsequent medication management to address social and relational deficits and anxious symptoms. R. 694.

The month after the consultative examination, Richard started treatment at the Bradley Free Clinic. At his initial screening, he reported that he lived alone in his home and felt safe. He isolated himself and did not like to be around people. He reported that "half the time" he did not shower or take care of his activities of daily living. He said that his problems made it extremely difficult for him to work, take care of things at home, and get along with other people. R. 699–700. He reported vague paranoid feelings regarding his close friends and reported auditory hallucinations of a child's voice that was exacerbated by stress. His treatment at Intercept had been terminated and he had been without his medications for months. His son had been removed from his custody in February and Richard needed to resume psychiatric treatment and attend parenting classes to regain custody of his son. R. 703.

He appeared disheveled and fatigued. His behavior was cooperative, calm, pleasant and with good eye contact. He was oriented to situation, time, place, and person and had normal attention and concentrating ability. He was alert and his memory was intact. Insight, judgment, thought processes, and motor activity all were intact. His mood was anxious with a congruent affect. Id.

12

On July 13, 2023, Richard reported feeling much better after restarting gabapentin and hydroxyzine. His sleep had improved, his mood was better, and the feelings of being overwhelmed or having a panic attack had lessened. R. 702. On November 16, 2023, Richard reported that he generally slept okay but woke up sometimes and needed medication to go back to sleep. He lived alone and did not have many family members or friends around and said he spent most of his time alone in his apartment. He did not request a medication change. He would return to the office as needed. R. 715.

### B. Hearing Testimony

At the first hearing held on February 1, 2023, Richard testified that he was living with his 13-year-old son in an apartment. R. 41–42. He had worked for a temporary employment agency for three months in late 2021 and early 2022. R. 43. Prior to that he had worked for a masonry company from May 2019 through March 2020, doing labor such as power washing, mixing cement, and cleaning up when work was completed. R. 44–45. He resigned from the job because he had a problem with his coworkers. R. 46. He also worked as a pizza delivery person for five or six months and that job also ended because he was not comfortable being around people. R. 46–47. He also worked for a construction company for approximately two years in 2016 and 2017. He initially worked as a parts runner, where he essentially worked alone, but when they told him he would need to work in the shop he resigned because he did not want to work around people. R.48–49. He also worked as a cook and dishwasher at a pancake house for four or five months, and prior to that, as a dishwasher for several years. He stopped working there when he felt like people did not want him to be there. R. 50. He also

worked as a cashier at a thrift store, but resigned from that job because he did not want to be around other people. R. 52–53.

Richard shopped for groceries late at night so he would not have to be around many people. He feels like people are trying to "get him," or that they are talking about him. R. 53. Every day he feels like people are picking on him, and he also feels like he is going to die. He would be happy sitting alone in the dark by himself all day. R. 54. He starts to feel anxious and locks his bedroom door when he gets antsy. He does not attend any of his son's activities at school because he does not want to have to be around other people. R. 55.

Richard had surgery on his left shoulder in 2001 and has a prosthetic joint. His arm occasionally pops out of the socket. He has trouble with his left arm and cannot lift it overhead. Using the arm causes it to pop out of the socket which is very painful and the shoulder joint hurts in rainy weather. R. 56–57.

Richard had been in addiction recovery for four or five months. Abstaining from drugs makes his depression and paranoia worse. R. 58–59. The prescription medications he takes help his symptoms, but he still feels very anxious a couple of times a month or more and most days feels a general level of anxiety. R. 60–61.

Richard takes his son to school, stops at the clinic on his way home, and then spends the day in his apartment, where he watches television or cleans. His mind wanders while he watches television. He is able to finish projects he starts, although some tasks take longer to complete than they should. He picks up his son from school and his son prepares something to eat in the microwave and then they typically watch television in separate rooms. R. 61–63.

Richard has some friends that he talks to on the phone, but not in person. He does not go anywhere but to doctor appointments and the grocery store. R. 63–64.

Richard was told he needed additional surgery on his shoulder in 2018 and that he needed to see the doctor who performed the original surgery, but the doctor's practice is in another city and Richard could not travel there. When he was experiencing pain in his shoulder in 2018 the doctor prescribed narcotic pain medication which is how he became addicted to drugs. R. 64–65.

The ALJ asked the vocational expert (VE) to consider a hypothetical person in their mid-forties with a high-school education and a work history similar to Richard's work history. The person would have no exertional limitations, but would be limited to performing simple, routine tasks and making simple work-related decisions. The VE testified that such a person could do Richard's previous work as a delivery person or dishwasher. He could also do the work of an automobile detailer, a busser in a dining room, a housekeeper or office cleaner, or a laundry or linen sorter. R. 69–72.

If the person reduced their interaction with supervisors to no more than frequently and reduced their interaction with coworkers and the public to only occasionally, the person would be able to do Richard's past work as a dishwasher, as well as the jobs of automobile detailer, busser, housekeeper/office cleaner, and laundry/linen sorter. R. 72–73. If the person were limited to simple, routine, and repetitive tasks, could have only brief superficial interaction with the public, could have only occasional changes to the work setting, would need 24 hours' notice of work changes, and would be off task 8 percent of the day, the person still would be able to do the job of dishwasher, and the other jobs listed above except for the busser job. R.

15

74–75. If the person could have no interaction with coworkers all jobs would be eliminated. R. 76.

A supplemental hearing was held in this matter on November 20, 2023, after Richard had been assessed at the consultative mental health examination. Richard testified that he had started treatment at Bradley Free Clinic and felt better after restarting hydroxyzine, gabapentin, and trazodone, but still did not leave his apartment because he did not want to be around people. He said he cannot use his left arm because he "had a tumor in it and it ate the joint and the bone up." R. 87. He continued to receive treatment at the Roanoke Treatment Center and went there Monday through Saturday for individual and group therapy. He had not used illicit substances since February 2023, but did smoke marijuana a few times per month because it relaxed him and made him less paranoid. He reported having racing thoughts daily. R. 89.

### C. State Agency Determinations

When state agency experts reviewed Richard's application, both initially and on reconsideration, they found he did not have a medically determinable impairment because the medical evidence in the file was insufficient to establish a diagnosis. R. 97–116.

### IV. Analysis

The ALJ found that Richard's left arm impairment was not severe, and she further found that based on his severe mental impairments, he had the RFC to do work at all exertional levels with non-exertional limitations of being able to perform only simple, routine, and repetitive tasks, making simple work-related decisions in terms of judgment, workplace stress, or changes in the work setting, and needing to be notified a day in advance of any workplace changes. He was limited to frequent interaction with supervisors, occasional interaction with

16

coworkers, and no interaction with the public. He would be off task approximately eight percent of the total workday due to mental impairments. Based on this RFC and the testimony of the VE, the ALJ found that Richard could do jobs that exist in the economy, such as his previous work as a dishwasher, or that of an automobile detailer, housekeeper/office cleaner, or laundry/linen sorter, and therefore, was not disabled.

Richard argues that these findings by the ALJ are not supported by substantial evidence. He contends that the ALJ (1) did not adequately explain how she arrived at the conclusion that his left arm impairment is not a severe impairment under the regulations; (2) did not explain why she found that Richard had no more than a moderate limitation in the domain of concentrating, persisting, and maintaining pace; (3) failed to adequately explain her determination that Richard "can make simple work-related decisions in terms of judgment, workplace stress, or changes in the work setting;" (4) failed to explain how limiting Richard to frequent contact with supervisors, occasional interaction with coworkers, and no interaction with the public accommodated his marked limitation in interacting with others; (5) provided an improper hypothetical question to the VE; (6) did not properly evaluate Richard's daily activities in assessing his RFC; (7) did not properly consider Richard's difficulty in interacting with coworkers; (8) did not explain how she arrived at her conclusion that Richard would be off-task approximately eight percent of the workday; (9) did not perform a function-by-function assessment or provide a narrative explanation describing how the RFC accommodates Richard's moderate limitation in concentrating, persisting, or maintaining pace or his marked limitation in interacting with others; and (10) did not adequately address Richard's subjective allegations of his mental health difficulties.

17

### A. Non-Severe Arm Impairment

At step two of the sequential evaluation, the ALJ must determine whether the claimant has a medically determinable impairment that is "severe," or a combination of impairments that is "severe" under the regulations. An impairment is non-severe if it does not significantly limit a claimant's physical or mental ability to do basic work activities. Relevant to Richard's arm impairment, basic work activities include the ability to perform physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling. 20 C.F.R. §§ 404.1522, 416.922.

In Richard's case, the ALJ found that he had joint shoulder replacement surgery in 2018 due to a giant cell tumor and his orthopedist prescribed opiates for pain relief, resulting in addiction.[5] The ALJ further noted that although Richard reported some limits and pain, he had not sought treatment since that time, and concluded that the shoulder impairment was non-severe because it did not result in significant treatment or significant functional limitations. R. 17.

Richard argues that the ALJ erred in finding the arm impairment non-severe because she also found that he had a moderate limitation in adapting or managing himself when she was assessing the severity of his mental health impairments. The ALJ stated that Richard was able to bathe, dress, perform basic toileting, feeding, and hygiene, "with the exception of full

---

[5] Notwithstanding the ALJ's finding, the record does not support that Richard had a second shoulder surgery in 2018. In his function report, Richard said that he had an artificial limb after having a tumor in his arm in 2001. R. 334. At an emergency room visit in January 2019, Richard said that he was on daily opiates for more than a year after shoulder surgery but the orthopedist had stopped prescribing them for him. R. 399. At his hearing in front of the ALJ, Richard testified that he did not have surgery in 2018. Rather, he saw a doctor for pain related to the shoulder and the doctor prescribed opioid medication for pain relief. Richard also said that the doctor recommended that he have an additional surgery, but that Richard should see his original surgeon for the procedure. R. 64–65. There is no documentation of any shoulder surgery in the record.

18

use of his left arm due to pain and range of motion problems." R. 18. Richard argues that the ALJ erred when she failed to explain how the arm impairment did not impact his ability to do basic work activities while still finding that it limited his ability to take care of some of his activities of daily living.

The Social Security Administration describes an impairment as "not severe" when medical evidence establishes only a slight abnormality which has no more than a minimal effect on an individual's ability to work. Titles II and XVI: Medical Impairments That Are Not Severe, SSR 85-28, 1985 WL 56856 (S.S.A. 1985).[6]

> A determination that an impairment(s) is not severe requires a careful evaluation of the medical findings which describe the impairment(s) and an informed judgment about its (their) limiting effects on the individual's physical and mental ability(ies) to perform basic work activities; thus, an assessment of function is inherent in the medical evaluation process itself. <u>At the second step of sequential evaluation, then, medical evidence alone is evaluated in order to assess the effects of the impairment(s) on ability to do basic work activities</u>. If this assessment shows the individual to have the physical and mental ability(ies) necessary to perform such activities, no evaluation of past work (or of age, education, work experience) is needed. Rather, it is reasonable to conclude, based on the minimal impact of the impairment(s), that the individual is capable of engaging in SGA.

<u>Id.</u> at *4 (emphasis added).

Thus, to establish that an impairment is "severe" under the regulations, a claimant must provide medical evidence of the impairment and its severity. <u>Ramsey v. Colvin</u>, No.

---

[6] Social Security Rulings (SSRs) are interpretations by the Social Security Administration of the Social Security Act. They do not carry the force of law but are binding on the Social Security Administration and ALJs when they are adjudicating Social Security cases. <u>Dowling v. Comm'r of Soc. Sec. Admin.</u>, 986 F.3d 377, 387 n.9 (4th Cir. 2021) (internal citations omitted). SSRs are entitled to deference unless they are clearly erroneous or inconsistent with the law. <u>Keller v. Berryhill</u>, 754 F. App'x 193, 196 (4th Cir. 2018) (internal citations omitted).

19

1:13CV553, 2015 WL 828119, at *5 (M.D.N.C. Nov. 6, 2015) (citing 20 C.F.R. §§ 404.1512(c),

416.912(c) and SSR 85-28, 1985 WL 56856 at *4). "Severity is not an onerous requirement for

the claimant to meet, but it is also not a toothless standard...." <u>Kirby v. Astrue</u>, 500 F.3d 705,

708 (8th Cir. 2007) (internal citations omitted). A claimant's statements regarding the severity

of an impairment are insufficient to establish severity at step two. <u>Kaston v. Colvin</u>, No. 5:15-

CV-00539-FL, 2017 WL 327484, at *6 (E.D.N.C. Jan. 3, 2017) (internal citations and

quotations omitted).

The record in Richard's case contains no medical evidence regarding his arm

impairment. There are no records of any examination of the arm by a doctor, and no record

of his complaining about the arm to any medical care provider. The consultative examiner

who assessed his mental health status in 2023 noted that Richard had seemingly uncontrollable

left arm/hand movements that abated once he placed his hand in his jacket pocket, R. 692,

but there is no discussion of what caused the movements or if they resumed when he took his

hand out of his pocket. Moreover, Richard did not mention any problems with his arm or

hand when discussing his previous jobs. While he testified that he could not lift his arm over

his head and that lifting things caused him pain, R. 57, he did not indicate that the arm caused

any issues with any of his past jobs, including operating a power washer, mixing cement,

delivering pizzas, working as a parts runner, cooking at a pancake house, or working as a

dishwasher or cashier. R. 44–52. The ALJ acknowledged Richard's testimony about his arm

pain and included it in her assessment of his ability to take care of his personal needs, but

given the lack of evidence in the record that Richard's arm impairment limited his ability to

do work activities, the ALJ did not err in finding that any impairment related to the arm is non-severe.

Alternatively, even if the ALJ erred by finding Richard's arm impairment was non-severe, the error was harmless because she found several of Richard's other impairments to be severe. "Where an ALJ has already determined that a plaintiff suffers from at least one severe impairment, any failure to categorize an additional impairment as severe generally cannot constitute reversible error, because, 'upon determining that a claimant has one severe impairment, the [analysis] must continue with the remaining steps in [the] disability evaluation.'" Dowd v. Saul, No. 1:18CV640, 2020 WL 1668700, at *13 (M.D.N.C. Mar. 6, 2020), report and recommendation adopted, 2020 WL 1660117 (M.D.N.C. Apr. 3, 2020) (quoting Maziarz v. Secretary of Health and Human Servs., 837 F.2d 240, 244 (6th Cir. 1987)). Because the ALJ found Richard's mental health impairments to be severe and proceeded with her analysis of his claim, her finding that his arm impairment was not severe provides no basis for remand.

### B. Residual Functional Capacity

A claimant's RFC "is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P, 1996 WL 374184 at *2 (S.S.A. 1996). "Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the

21

RFC assessment must include a discussion of the individual's abilities on that basis." Id. "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." Id.

Before reaching the mental RFC assessment at Step 4 of the sequential evaluation, the adjudicator must first determine whether a claimant has a severe mental impairment at Step 2 of the sequential evaluation, and if so, whether he meets a listing for a mental impairment at Step 3 of the sequential evaluation. In making the Step 3 determination for a mental impairment, the adjudicator assesses an individual's limitations and restrictions described in categories identified in the "paragraph B" and "paragraph C" criteria of the adult mental disorders listings. The mental disorders listings are set forth at 20 C.F.R. Part 404, Subpart P, Appendix 1. 20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526. The adjudicator determines whether the claimant's limitations are none, mild, moderate, marked, or extreme. 20 C.F.R. Part 404, Subpart P, Appendix 1, §§ 12.00E and 12.00F.

To satisfy "paragraph B" criteria for a finding of disabled at Step 3, a person must have an "extreme" limitation of one, or a "marked" limitation of two of the four areas of mental functioning. Id. § 12.00A(2)(b). The areas of mental functioning are (1) understanding, remembering, and applying information; (2) interacting with others; (3) concentrating, persisting, and maintaining pace; and (4) adapting or managing oneself. Id. §12.00E. Relevant to Richard's case, a "moderate" limitation means the person has a fair ability to function in this area independently, appropriately, and effectively on a sustained basis. Id. §12.00F(2)(c). A "marked" limitation in an area means that a person has a seriously limited ability to function in the area independently, appropriately, and effectively on a sustained basis. Id. §12.00F(2)(d).

22

Notably, the limitations identified in the listing criteria are not an RFC assessment, and the mental RFC assessment used at Steps 4 and 5 of the sequential evaluation process requires a more detailed assessment "by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings." SSR 96-8p, 1996 WL 374184 at *4. When determining a claimant's RFC at Step 4 of the sequential evaluation, the adjudicator considers the claimant's medical history, medical signs and laboratory findings, the effects of treatment, reported daily activities, lay evidence, recorded observations, medical source statements, effects of symptoms that are reasonably attributed to a medically determinable impairment, evidence from attempts to work, need for a structured environment, and work evaluations, if available. Id. at *5. The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts and non-medical evidence. Id. at *7.

In Richard's case, at Step 3 of the sequential evaluation, the ALJ determined that he had a mild limitation in the domain of understanding, remembering, or applying information; a marked limitation in interacting with others; a moderate limitation with regard to concentrating, persisting, or maintaining pace; and a moderate limitation in adapting and managing oneself. R. 18. Because he did not have at least two "marked" limitations or one "extreme" limitation, the paragraph B criteria of the listed impairments were not met. R. 18.

When the ALJ reached the RFC assessment at Step 4, she summarized Richard's testimony at both hearings, reviewed the medical evidence in the record and the opinion of the consultative examiner, and noted that the state agency experts did not provide opinions about Richard's disability because there was insufficient evidence in the record. R. 19–24.

23

Based upon her assessment of the record, the ALJ limited Richard to simple, routine, and repetitive tasks, to making simple work-related decisions in terms of judgment, workplace stress, or changes in the work setting, to needing a day's notice in advance of any workplace changes, to frequent interaction with supervisors, occasional interaction with coworkers, and no interaction with the public. She also found that Richard would be off task approximately eight percent of the total workday.

As set forth above, Richard makes several arguments related to the determinations made by the ALJ at both Step 3 of the evaluation process and regarding the RFC assessment by the ALJ. Where appropriate, the arguments are grouped and addressed together.

### (1) Moderate Limitation in the Domain of Concentrating, Persisting, and Maintaining Pace

Richard claims that the ALJ did not explain why she found that he had no more than a "moderate" limitation in the domain of concentrating, persisting, and maintaining pace. In making that determination, the ALJ cited to the consultative examiner's assessment that Richard could accurately state the current city and year and the number of quarters in $1.50 and had accurate recall of six-digit numbers immediately and two out of three words after a ten-minute delay. The ALJ also cited to Dr. Camden's assessment that Richard could sustain simple and complex work. In addition, the ALJ cited to Richard's statement that he did not handle stress well and did not follow instructions well. The ALJ also noted that Richard had held numerous temporary jobs and that he said that in January 2022 he was working at a packaging center and enjoyed his work. R. 18.

Richard claims that the first two examples only demonstrate "basic knowledge" and that recalling words and numbers "addresses memory." He also asserts that the fact that Richard had several temporary jobs "seems to indicate he has difficulty sustaining employment." Pl.'s Brief, ECF No. 13 at 15. Richard's arguments miss the mark for two reasons.

First, he is asking the court to reweigh or reassess the evidence, or to substitute its judgment for that of the Commissioner, which it cannot do. Hays, 907 F.2d at 1456; Laws, 368 F.2d at 642. The issue before the court is whether the ALJ supported her determination with evidence from the record and she has done so. Second, Richard ignores the other evidence cited by the ALJ--that the consultative examiner concluded that Richard could sustain simple and complex tasks and that Richard reported working and enjoying his work in 2022. The court finds that the ALJ reviewed the evidence as a whole and cited to the record in support of her determination that Richard has no more than a moderate limitation in his ability to maintain concentration, persistence, and pace. Therefore, substantial evidence supports her determination of this issue.

### (2) Function-By-Function Assessment, Ability to Make Simple Work-Related Decisions, and Limitations on Working Around Other People

Richard argues that the ALJ did not do a function-by-function analysis or provide a narrative discussion when she determined that her RFC findings account for his moderate limitations in concentration, persistence, and pace, and his marked limitations in interacting with others. Pl.'s Brief, ECF No. 13 at 18. He asserts that the ALJ's opinion leaves the court to guess at how she reached her conclusions.

As the Fourth Circuit emphasized in <u>Monroe</u>, 826 F.3d at 187–88) (internal citations omitted), under SSR 96-8p, an RFC assessment must first identify the claimant's functional limitations or restrictions and assess his work-related abilities on a function-by-function basis, including the function listed in the regulations. Only after such an analysis may an ALJ express the claimant's RFC. Arriving at the RFC before analyzing the claimant's limitations function-by-function creates the danger that the adjudicator will overlook relevant limitations or restrictions or that the adjudicator will find limitations or restrictions that the claimant does not actually have. <u>Id.</u> However, there is no per se rule that a case must be remanded when an ALJ does not perform an explicit function-by-function analysis. <u>Mascio</u>, 780 F.3d at 636. Rather, "remand may be appropriate where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." <u>Id.</u>

In <u>Mascio</u>, the case was remanded because the ALJ's assessment of the claimant's RFC did not address conflicting evidence in the record and did not include an analysis of whether the claimant could perform certain functions for an entire workday. <u>Id.</u> at 637. Here, the ALJ summarized Richard's testimony at both hearings, reviewed the medical evidence in the record and the opinion of the consultative examiner, and noted that the state agency experts did not provide opinions about Richard's disability because of a lack of evidence in the record.

The ALJ found that even considering Richard's moderate limitation in concentration, persistence, and pace, he could sustain simple or complex tasks without supervision and could make simple work-related decisions in terms of judgment, workplace stress, or changes in the work setting. She based her determination on the opinion of the consultative examiner who

26

found that Richard could sustain simple or complex tasks without supervision. In addition, she relied on the examination notes from the Bradley Free Clinic where the doctor noted that Richard was cooperative, calm, and pleasant, had normal attention and concentration, intact memory, average intelligence, and intact thought processes with unremarkable content.

When assessing Richard's ability to work around other people, although the ALJ found at Step 3 of the sequential evaluation that Richard had a marked limitation in his ability to interact with people, she explained that she was persuaded that Richard could interact frequently with supervisors because he attended substance abuse treatment, including group sessions, and his providers indicated that he was cooperative. Richard argues that the ALJ did not properly consider his difficulty in interacting with coworkers given his "frequently aborted work attempts due to difficulty interacting with others caused by his anxiety and paranoia." Pl.'s Brief, ECF No. 13 at 16–17. However, the ALJ acknowledged that although Richard had worked numerous temporary jobs, his anxiety and social anxiety issues persisted, which led her find that he could work jobs that required only occasional interaction with coworkers. Finally, because of his ongoing and consistent statements of paranoia when around others, she limited him to no interaction with the public.

The court finds that the ALJ adequately explained how she arrived at her conclusions regarding Richard's RFC and that the explanation is clear and supported by the record. She "built the logical bridge" between the evidence and her conclusions and the court is not left to guess at how she reached her conclusions. Accordingly, the ALJ's assessment of Richard's RFC provides no basis for remand.

### (3) Hypothetical Question

Richard next argues that there is a conflict between the ALJ's limitation of no interaction with the public and the hypothetical question posed by the ALJ to the VE where she described a person as having interaction with the public "never other than just that brief superficial interaction but otherwise never dealing with the public." R. 73–74. Richard argues that the limitation in the hypothetical question is less restrictive than the "no interaction" limitation found by the ALJ and that the ALJ failed to reconcile the discrepancy or provide an explanation for the discrepancy. Pl.'s Brief, ECF No. 13 at 15–16.

The court does not find the limitation of "no interaction with the public" to be materially inconsistent with a hypothetical person who can interact with the public "never other than just that brief superficial interaction with the public." In addition, substantial evidence supports the ALJ's question to the VE because Richard does have brief superficial interactions with the public without incident when he grocery shops and attends medical appointments and drug treatment. "[W]hile questions posed to the vocational expert must fairly set out all of claimant's impairments, the questions need only reflect those impairments that are supported by the record." Naylor v. Astrue, 693 F. Supp. 2d 544, 566 (S.D. W.Va. 2010) (citing Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir.1987)). The court finds no error in the hypothetical question posed to the VE.

### (4) Daily Activities

The ALJ found that despite Richard's marked limitation in social functioning, he could frequently interact with the public and occasionally interact with coworkers, but never with the public. In support of these limitations, the ALJ found that Richard attended substance

28

abuse treatment, including group sessions, and that his providers indicated he was pleasant and cooperative. In addition, he had held a series of temporary jobs. R. 23. Richard cites Woods v. Berryhill, 888 F.3d 686, 694 (4th Cir. 2018) superseded on other grounds as stated in Siders v. Commissioner of Social Security, No. 21-2329, 2023 WL 4488259 (4th Cir. 2023), for its holding that an ALJ may not consider the type of activities a claimant can perform without also considering the extent to which he can perform them. In Woods, the ALJ found that the claimant could maintain her personal hygiene, cook, perform light household chores, shop, socialize with family members, and attend church services on a regular basis. However, the ALJ did not consider the plaintiff's statements that she could not button her clothes, had trouble drying herself after bathing, sometimes needed help holding a hairdryer, had trouble cutting, chopping, dicing, and holding silverware or cups, took all day to do laundry, shopped only for necessities which took a long time, and could not turn the pages of a book when she was reading to her grandchildren. Id. at 694–95. The court held that on remand, the ALJ should consider not just the type of daily activities in which Woods engaged, but also the extent to which she could perform them in assessing her credibility. Id. at 695.

In Richard's case, the ALJ acknowledged his testimony that although he had worked at a lot of temporary jobs since 2008, he spends most of his time in a dark room and does not participate in activities outside the home due to his paranoia and anxiety when he is around other people. She noted that he does his grocery shopping early in the morning or late in the evening when the store is less crowded and that he took care of his personal hygiene and activities of daily living "half the time."

29

Unlike the claimant in <u>Woods</u>, Richard does not point to any limitations on activity that the ALJ failed to consider. The ALJ considered Richard's testimony regarding his social limitations and isolation, but also considered evidence in the record showing that his symptoms improved with medication, he enjoyed his work at a packaging center, he attended substance abuse treatment, and his health care providers indicated that he was cooperative. R. 21–23. It is the province of the ALJ to weigh conflicts in the evidence and she did so here. Richard's citation to <u>Woods</u> is inapposite and <u>Woods</u> does not direct that Richard's case should be remanded.

### (5) Off-Task Approximately Eight Percent of the Day

Richard argues that the ALJ did not explain how she arrived at her conclusion that he would be off-task approximately eight percent of the workday. The ALJ explained the following:   .

> While the examination notes show an intact memory, and often unimpaired attention and concentration, I considered his anxiety in providing the claimant receive 1 day, or 24 hours of advance notice for workplace changes. In an abundance of caution, I also provided that the claimant could be off task approximately 8% of the workday, which the vocational expert clarified, and I agreed, would be 8% of the total workday, and not 8% of a particular portion of the workday. These findings appear consistent with the claimant's ongoing complaints, and in consideration of an improvement in symptoms when he consistently takes medication as prescribed.

R. 23–24. Because the ALJ earlier summarized Richard's complaints and cited to the record showing that his complaints improved with medication but were not totally alleviated, the court finds the ALJ sufficiently explained why she found that Richard would be off-task eight percent of the day.

## C. Assessment of Subjective Allegations

Richard also contends that the ALJ did not properly assess his subjective complaints. When evaluating a claimant's reported symptoms, the ALJ first considers whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the individual's symptoms. Once an underlying physical or mental impairment is established, the ALJ evaluates the intensity and persistence of symptoms to determine the extent to which the symptoms limit a claimant's ability to perform work-related activities. Social Security Ruling 16-3P Titles II and XVI: Evaluation of Symptoms in Disability Claims, 2017 WL 5180304, at *3–4 (S.S.A. 2017). In making the second determination, the ALJ first looks at the objective medical evidence. Id. at *5. If the ALJ cannot make a disability determination that is fully favorable based on objective medical evidence, other evidence, such as statements from the claimant, medical sources, and other sources are considered. Id. at *6.

However, statements about symptoms alone will not establish disability. 20 C.F.R. § 404.1529(a).

> In evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings, and statements about how your symptoms affect you. We will then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work.

Id.

In this case, the ALJ acknowledged Richard's testimony about the extent to which his mental impairments cause him to avoid people and stay alone in his room. However, she also

31

noted that Richard has been treated for his psychological disorders, somewhat successfully, although he also had significant periods of noncompliance and periods where he had stopped taking his medications completely, resulting in a return of symptoms. R. 22–23. She noted that despite his improvement, especially in his depressive symptoms, he continued to report anxiety in crowds and paranoia of others. R. 23. As discussed above, the ALJ also relied on the consultative examiner's assessment that Richard could sustain simple or complex tasks without supervision, and on the mental health assessment performed at the Bradley Free Clinic.

The ALJ in this case properly assessed Richard's subjective complaints and adequately explained why she did not find his complaints fully supported by the evidence in the record. The court finds no error in the ALJ's assessment of Richard's subjective allegations of his limitations.

## V. Conclusion

The court concludes that the ALJ in this case carefully and thoroughly explained how she reached her conclusions, and that she "built the logical bridge" between the evidence in the record and her conclusions. The court is not left to guess at how she reached the conclusion that Richard is not disabled and her determination is supported by substantial evidence in the record. Accordingly, the court **AFFIRMS** the Commissioner's decision that Richard is not disabled. This matter is **DISMISSED** and **STRICKEN** from the active docket of the court.

An appropriate order will be entered.

It is so **ORDERED**.

Entered: July 8, 2025

Michael F. Urbanski
Senior United States District Judge

33